[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February10, 2005
THOMAS  K. KAHN
CLERK**

_____

No. 04-12207

_____

D. C. Docket No. 02-61584-CIV-JIC
BKCY No. 98-25090-BKC-RBR

INTERNATIONAL MANAGEMENT ASSOC.,

                                                        Debtor.

-------------------------------------------------------------

WILLIAM B. REILY,

                                                        Plaintiff-Appellant,

        versus

SONEET R. KAPILA, Trustee for
International Management Associates, Inc.,

                                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(February 10, 2005)**

Before BIRCH, KRAVITCH and CUDAHY[*], Circuit Judges.

CUDAHY, Circuit Judge:

Plato once said that "[w]hen a Benefit is wrongly conferred, the author of the Benefit may often be said to injure." The bankruptcy claim presented here, brought by a Chapter 7 bankruptcy trustee, seeks avoidance of a $100,000 payment to a shareholder in the debtor corporations pursuant to 11 U.S.C. § 548. The potential recovery of that payment under 11 U.S.C. § 550(a)(1) requires us to assess whether providing the unquantifiable key to a larger transaction can qualify a party as an "entity for whose benefit" a putatively voidable transfer is made. 11 U.S.C. § 550(a)(1) (2004). We believe that, under the circumstances presented here, "benefit" has been too broadly defined to meet the requirements of 11 U.S.C. § 550(a)(1).

## I.

Although the briefs submitted here are not very informative about either the relevant facts or the precise issues, we think that the facts can be usefully summarized. The instant bankruptcy involves a number of interlocking corporations that provided and managed assisted living facilities in southern

---

[*]Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit, sitting by designation.

Florida. Four of these corporations operated assisted living facilities, and the fifth, International Management Associates (IMA), was formed to provide a management vehicle for the operating companies and to permit those companies to share overhead expenses. The assets of the four operating companies were subject to a security interest in favor of a corporate lender, Health Care REIT.

IMA was formed by Dr. Gadi Gichon and the late Gavriel Shade in 1995 to manage the operations of the original assisted living facility. Dr. Gichon and Shade entered into an amalgamation agreement with William B. Reily later that same year, whereby the three became equal shareholders in IMA and other associated corporations. At that time, Gichon apparently loaned the original assisted living facility corporation $590,000, and that company executed a promissory note payable to him. In 1996, the amalgamation agreement was amended after three additional assisted living facilities were purchased and financed through Health Care REIT. It was not long before the living facility venture encountered financial difficulties, and in early 1997 Reily was removed from management and was replaced by another individual. Financial problems continued to mount, however, prompting Dr. Gichon and Shade to once again approach Reily seeking help in June of 1997, when the three began to discuss the possibility of selling the assisted living facilities. Thereafter, Reily approached

Health Care REIT, which agreed to purchase the facilities and lease them back to Reily on the dual conditions that Reily acquire the corporate interests of Dr. Gichon and Shade and that Dr. Gichon guarantee the new financial arrangement. Dr. Gichon and Shade agreed to these terms in November of 1997, and in December, Reily formed a corporation, Premier. Throughout its existence, Reily was Premier's sole shareholder and officer. Premier entered into an agreement with Health Care REIT restructuring into a new financial arrangement its mortgage loans secured by the living facilities. Under this agreement, Health Care REIT took title to the facilities and granted Premier a lease for them and a working capital loan of approximately $2.248 million to acquire certain shareholder interests, to pay Dr. Gichon the balance on his outstanding loans and to pay off other creditors. It was a condition of Heath Care REIT's performance under the agreement that Reily hold the sole shareholder interest in the debtor corporations. On February 11, 1998, the deal closed, and Gichon and Shade formally turned over their interests to Reily and Health Care REIT. At closing, Dr. Gichon received from the corporate debtors slightly over $700,000, of which $100,000 represented payment for his stock in these corporate debtors.[1]

---

[1]During oral argument, many questions were raised concerning the source of the funds for the $100,000 transfer. Whatever the answer to this question may be, we do not think it bears upon our approach to resolution of this case.

After the closing, the assisted living facilities were operated and managed exclusively by Premier under the lease arrangement for approximately one year. In early 1999, Premier assigned the leases from Health Care REIT to another entity, Assisted Health Ventures Holdings, Inc. This transaction relieved Gichon and Shade of their personal guarantees undertaken at the February 1998 closing and netted Premier over $300,000.

Unfortunately, however, the working capital loan was not sufficient to extinguish all creditor liabilities, and the debtor corporations, left without assets, entered bankruptcy only five months after the closing. In July of 1998, the five debtor corporations filed separate voluntary petitions under Chapter 7, and these bankruptcy cases were consolidated in *In re International Management Associates*. Thereafter, the Trustee in Bankruptcy, Soneet R. Kapila, filed suit against Premier and against Dr. Gichon and Reily, who were insiders of the debtors at all times relevant to this proceeding under 11 U.S.C. § 101(31)(B)(I)-(iii).[2] Among other claims, the trustee sought recovery of allegedly fraudulent and preferential transfers made to Dr. Gichon. In an attempt by the trustee to pierce Premier's corporate veil and hold Dr. Gichon and Reily liable for transfers

_____

[2] The trustee voluntarily dismissed the claims against Shade, who had passed away in the interim.

5

of debtors' assets, the complaint also alleged that Premier was a continuation of the business of the debtors because it was under the control of Reily, who was also a shareholder and officer of the debtor corporations. Though Dr. Gichon and Reily filed answers, Premier never filed a responsive pleading. Pursuant to a default judgment issued against Premier on January 11, 2001, the bankruptcy court found that Premier was an alter ego of the debtors and held that it was liable for all claims against and liabilities of the debtors, including any fraudulent or preferential transfers of the debtors' assets. At proceedings on January 16 and 17, 2002, the bankruptcy court reasoned that the default judgment was binding on Dr. Gichon and Reily in all subsequent proceedings since they had known of the charges against Premier but had not defended against them. The court allowed the trustee to avoid as fraudulent the $100,000 transfer which had been made to obtain Dr. Gichon's stock in the debtors, and further held that the funds could be recovered from Dr. Gichon and Reily jointly and severally. As explained by the court, Reily was the "primary beneficiary" of the transfer to Dr. Gichon "as he wound up with 100% of the stock of Premier, along with the control of all of the assets of the Debtors within his own closely held corporation," and so was the "entity for whose benefit the transfers were made pursuant to 11 U.S.C. § 550." (Bankruptcy Op. p. 17).

6

On appeal, the district court reversed the bankruptcy court as to the liability of Dr. Gichon, finding that he was not bound by the default judgment against Premier because he could not have compelled Premier to defend itself against the charges and thus could not have contested the default judgment. Trying to follow in Dr. Gichon's footsteps, Reily also sought relief from liability on the grounds that there was no allegation that he had received fraudulent or preferential transfers. The district court refused to grant Reily relief, however, declining to view as clearly erroneous the bankruptcy court's finding that Reily had received the "benefit" of complete ownership of the stock in the debtor corporations. The district court further stated that unlike Dr. Gichon, Reily, as sole shareholder and officer of Premier, had the ability to answer the complaint and defend the suit on behalf of Premier.

We review the decision of the district court on the same basis that it reviewed the bankruptcy court–legal determinations *de novo* and factual findings for clear error. *General Trading, Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1494 (11th Cir. 1997).

## II.

## A.

We must first examine the basis upon which the trustee seeks to avoid this

7

transfer. The bankruptcy court determined that the $100,000 transfer to Dr. Gichon was avoidable as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B). (Bankruptcy Op., p. 17). The evidence in the record relevant to that determination is sparse and there has been little explanation of it by the parties. Reily argues that there has been no fraudulent transfer but cites no evidence.

Under 11 U.S.C. § 548(a)(1)(B) (2004), a trustee in bankruptcy may avoid any transfer made or incurred one year before the date of filing if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation," and if the debtor was either insolvent on the date the transfer was made, was left undercapitalized by the transfer or intended to incur further debt beyond its ability to pay. Thus, with respect to a fraudulent transfer, the lynchpin of voidability here is whether there was less than adequate consideration for the property transferred. The record and the opinions below tell us little about the value of the stock, and Reily's argument would suggest that it had substantial value. However, since the corporations were in bankruptcy, we may assume that Dr. Gichon's stock was worth less than $100,000 and in all probability was worthless. In any event, no one will be prejudiced by accepting this "worthless" hypothesis as a working assumption.

B.

8

Since the debtor received "less than a reasonably equivalent value in exchange," the transfer was fraudulent and voidable, and so recovery can be sought from Dr. Gichon, the transferee, but can it also be sought from Reily on the theory that he was a beneficiary of the transfer? The bankruptcy court held that the trustee was entitled to recover from Reily pursuant to 11 U.S.C. § 550(a)(1) (2004), which allows a trustee to "recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from–(1) the initial transferee of such transfer *or the entity for whose benefit such transfer was made . . . .*" (emphasis added).

The overarching purpose of the transaction before us was to obtain a loan from Healthcare REIT to restructure the financing of the assisted living facilities and to provide capital for continued operations. A condition of that loan was that Reily be the sole owner of the stock of the debtor corporations. Therefore, the acquisition of the stock was in the interest of furthering the loan and the restructuring–goals which fulfilled Reily's purposes. Hence, Reily was "benefitted" in a larger sense when he obtained complete control of the debtors' assets and therefore fulfilled a necessary condition of obtaining the funds from Health Care REIT. This is the "benefit" that both the trustee and the bankruptcy court attributed to Reily in order to underpin liability. (R. at 389; Bankr. Op., p.

9

17) (stating that Reily "was the primary beneficiary of the transfers to Gichon because he wound up with 100% of the stock of Premier, along with the control of all the assets of the Debtors within his own closely held corporation."). However, this sort of unquantifiable advantage is not the sort of "benefit" contemplated by 11 U.S.C. § 550(a).

The paradigm case of a benefit under § 550(a) is the benefit to a guarantor by the payment of the underlying debt of the debtor. *See In re Coggin*, 30 F.3d 1443, 1453 (11th Cir. 1994) (stating that the phrase "entity for whose benefit such transfer was made" "typically has been employed when the trustee attempts to recover from a guarantor of an underlying debt"); 5 *Collier on Bankruptcy* ¶ 550.02 [4] at 550-17 (15th ed. 1984). *See also In re Finley, Kumble, et al.*, 130 F.3d 52, 57 (2nd Cir. 1997) (stating that the phrase "entity for whose benefit such transfer was made" "references entities that benefit as guarantors of the debtor, or otherwise, without ever holding the funds."); *In re Bonded Financial Services, Inc.*, 285 F.2d 890, 895 (7th Cir. 1988) (stating that "the paradigm 'entity for whose benefit such transfer was made' is a guarantor or debtor.").

The example of a debt and a guarantor affords some insight into the intention of Congress in enacting § 550(a). The fact that Reily attained complete control over the debtors' assets does not give rise to a quantifiable benefit or one

bearing the "necessary correspondence to the value of the property transferred or received." *Mack v. Newton*, 737 F.2d 1343, 1359-60 (5th Cir. 1984).[3] The immediate facts here are that debtor corporations paid $100,000 for stock worth less than $100,000 (and that was probably worth nothing). There is no direct benefit to Reily in a transaction that reduced the assets under his control by $100,000 but increased to an unquantifiable extent the concentration of his control or ownership of that shrunken asset base. The only "benefit" cited by the bankruptcy court was the winning of 100% control over depleted assets. This is not a tangible or a quantifiable benefit. *See id.* (rejecting as too broad the trustee's allegation that the principals in a partnership had received an incidental benefit from auctioning off cattle and using the proceeds to operate their dairy enterprise, deeming this "an incidental, unquantifiable, and remote benefit bearing no necessary correspondence to the value of the property transferred or received."). Even as a matter of arithmetic, the transfer here depleted and did not augment the assets of debtors controlled by Reily. The fact that Reily gained exclusive control of a smaller pool of assets does not, on the facts before us, weigh in the balance. The very fact that the bankruptcy estate received "less than a reasonably

---

[3] While *Mack* was decided under the Bankruptcy Act and not the Bankruptcy Code, we nonetheless find its language appropriate to the facts of this case.

equivalent value in exchange" for the $100,000 (to qualify the transfer as voidable under 11 U.S.C. § 550(a) would deprive Reily of any net benefit in the transfer. Thus, Reily's loss was $100,000 from the assets subject to his control, while his only gain was the value of the stock giving him 100% control, which, in order for the transfer to be voidable, was worth less than $100,000.

This case is immediately distinguishable from *In re B.S. Livingston & Co., Inc.*, 186 B.R. 841 (D.N.J. 1995), in which the defendants were benefitted when they sold the core of the debtor's business to a third party in exchange for lucrative positions in the new company. Although *Livingston* may present a "benefit" that is on the far edge of qualification under 11 U.S.C. § 550(a), there is no obvious violence to the language in stating that the benefit of a lucrative position, like the benefit experienced by a guarantor, may be considered direct, ascertainable and quantifiable, unlike the "benefit" attributed to Reily.

C.

Although strict equity may not be part of the test under the Bankruptcy Code, our approach is somewhat strengthened by the apparently inequitable consequences of unwinding this transfer at the expense of Reily. Under the bankruptcy court's apparent disposition, if the transaction is nullified and the $100,000 is recovered from Reily, Dr. Gichon would presumably recover his stock

12

interest in the debtor and the conditions of Health Care REIT's loan would not be met. This would leave Reily out $100,000 with nothing to show for it. There seems to be no authority under 11 U.S.C. § 550(a)(1) for pursuing an alternative course of unwinding, such as recovering the $100,000 from Reily and returning the stock to Dr. Gichon.[4] The result of such a reshuffle would be the same as if Reily had paid Dr. Gichon $100,000 directly for the stock and thereby achieved 100% control. Whether Reily possessed $100,000 available for this purpose is unknown. But, however one might judge the equity, Reily would have received something for his $100,000. As it stands, the bankruptcy court's assessment of liability against Reily seems to make possible an unbalanced outcome, for Dr. Gichon may still retain the $100,000, while Reily's stock interest is unaffected, although he has contributed $100,000 to the bankruptcy estate.

### III.

Since the "benefit" to Reily here is unquantifiable and, in the words of *Mack*

---

[4] Such authority would not stem from the trustee's avoidance powers, for avoidance of a transaction merely nullifies it, meaning that "the transfer is retroactively ineffective and the transferee legally acquired nothing through it." *In re Pearson Indus., Inc.,* 178 B.R. 753, 759 (Bankr. C.D. Ill. 1995) (internal references omitted). *See also In re Allied Companies, Inc.*, 155 B.R. 739, 744 (Bankr. S.D. Ind. 1992) (stating that the avoidance of a transfer relates back to before the bankruptcy was filed, deeming the obligation unpaid as of the petition date). Nor can we find support for any theory of recovery under which properties exchanged would not be returned to their original sources. The text of 11 U.S.C. § 550(a)(1) is silent as to whether, if a transfer is avoided and recovery is ordered, the parties to the transfer get back the property that they originally possessed, although this result ordinarily follows from a rescission.

*v. Newton*, *supra*, bears "no necessary correspondence to the value of the property transferred or received," this is not a "benefit" cognizable under 11 U.S.C. § 550(a)(1).  We therefore REVERSE the judgment of the district court and REMAND this case for further proceedings consistent with this opinion.

_____