[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-11071
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 15, 2012
JOHN LEY
CLERK

D.C. Docket Nos. 0:10-cv-62035-ASG; 0:08-bkc-10928-JKO

In Re: TOUSA, INC., et al.,

Debtors.
_____

SENIOR TRANSEASTERN LENDERS,

Defendant- Appellee,

CITCORP NORTH AMERICA, INC.,
CERTAIN FIRST LIEN TERM LENDERS,

Intervenors - Appellees,

versus

OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

Plaintiff - Appellant.

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 15, 2012)

Before TJOFLAT, PRYOR  and FAY, Circuit Judges.

PRYOR, Circuit Judge:

This bankruptcy appeal involves a transfer of liens by subsidiaries of TOUSA, Inc., to secure the payment of a debt owed only by their parent, TOUSA. On July 31, 2007, TOUSA paid a settlement of $421 million to the Senior Transeastern Lenders with loan proceeds from the New Lenders secured primarily by the assets of several subsidiaries of TOUSA.  Six months later, TOUSA and the Conveying Subsidiaries filed for bankruptcy.  In an adversary proceeding filed by the Committee of Unsecured Creditors of TOUSA, the bankruptcy court avoided the liens as a fraudulent transfer because the Conveying Subsidiaries did not receive reasonably equivalent value; ordered the Transeastern Lenders to disgorge $403 million of the loan proceeds because the transfer of the liens was for the benefit of the Transeastern Lenders; and awarded damages to the Conveying Subsidiaries.  The Transeastern Lenders and the New Lenders, as intervenors, appealed.  The district court quashed the judgment as to the Transeastern Lenders

and stayed the appeal of the New Lenders. This appeal by the Committee of Unsecured Creditors presents two issues: (1) whether the bankruptcy court clearly erred when it found that the Conveying Subsidiaries did not receive reasonably equivalent value in exchange for the liens to secure loans used to pay a debt owed only by TOUSA, 11 U.S.C. §548; and (2) whether the Transeastern Lenders were entities "for whose benefit" the Conveying Subsidiaries transferred the liens, 11 U.S.C. § 550(a)(1). We hold that the bankruptcy court did not clearly err when it found that the Conveying Subsidiaries did not receive reasonably equivalent value for the liens and that the bankruptcy court correctly ruled that the Transeastern Lenders were entities "for whose benefit" the liens were transferred. We reverse the judgment of the district court, affirm the liability findings of the bankruptcy court, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

We divide our summary of the events that led to this appeal into three parts. We first recount the uncontested facts that underlie this appeal. We then review the findings of fact and conclusions of law of the bankruptcy court. Finally, we review the decision of the district court.

### A. Factual Background

As of 2006, TOUSA, Inc., was the thirteenth largest homebuilding

enterprise in the country, with operations in Florida, Texas, the mid-Atlantic states, and the western United States. The company had grown rapidly, chiefly by acquiring independent homebuilders that became subsidiaries of TOUSA. These subsidiaries owned most of the assets of the enterprise and generated virtually all of its revenue.

To finance its growth, TOUSA borrowed a lot. TOUSA issued more than $1 billion of public bonds. That debt was unsecured, but was guaranteed by the Conveying Subsidiaries. TOUSA also borrowed funds under a revolving line of credit agreement administered by Citicorp North America, Inc. The Conveying Subsidiaries and TOUSA were jointly and severally liable for repayment of the revolving loan, which was secured by liens on the assets of the companies. Both the bond debt and revolving loan agreements provided that an adverse judgment for more than $10 million against TOUSA or any of its subsidiaries or a bankruptcy filing by TOUSA or any of its subsidiaries would constitute an event of default, which would permit the bondholders and Citicorp to declare all outstanding amounts of debt due immediately. As of July 31, 2007, TOUSA had approximately $1.061 billion of principal outstanding on its bond debt and $224 million outstanding on its revolving loan.

In June 2005, TOUSA entered a joint venture with Falcone/Ritchie LLC to

acquire homebuilding assets owned by Transeastern Properties, Inc., in Florida. TOUSA incurred more debt, this time from the Transeastern Lenders, to fund the Transeastern Joint Venture, but none of the Conveying Subsidiaries became an obligor or guarantor of the Transeastern debt.

The downturn in the housing market soon threatened the Transeastern Joint Venture. By October 4, 2006, the joint venture had defaulted on several obligations. At the end of that month, the Transeastern Lenders alleged defaults and demanded payment from TOUSA. In December 2006, the Transeastern Lenders sued TOUSA, and in January 2007, the Transeastern Lenders alleged that TOUSA was responsible for damages of over $2 billion.

On July 31, 2007, TOUSA executed settlements with its partner in the joint venture and the Transeastern Lenders. The settlements required TOUSA to pay more than $421 million to the Transeastern Lenders. To finance the settlements, TOUSA and some of its subsidiaries incurred new debt. Citicorp North America, Inc. agreed to syndicate two new term loans to TOUSA and the Conveying Subsidiaries: a $200 million loan from the First Lien Lenders, to be secured by first-priority liens on the assets of the Conveying Subsidiaries and TOUSA; and a $300 million loan from the Second Lien Lenders, to be secured by second-priority liens. Both loan agreements with these New Lenders required that the funds be

used to pay the $421 million settlement with the Transeastern Lenders. TOUSA also amended its revolving credit agreement with Citicorp.

The transaction was executed in several parts. First, Citicorp transferred $476,418,784.40 to Universal Land Title, Inc., a wholly-owned subsidiary of TOUSA that was not one of the Conveying Subsidiaries. Universal Land Title then sent a wire transfer of $426,383,828.08 to CIT, the administrative agent for the Transeastern Lenders. CIT disbursed the proceeds of that transfer on July 31 and August 1, 2007. The Transeastern Lenders received $421,015,089.15 and the remaining funds were dispersed to third parties to cover professional, advisory, and other fees.

*B. Bankruptcy Court Proceedings*

Six months later, TOUSA and the Conveying Subsidiaries filed petitions for bankruptcy under Chapter 11. The Committee of Unsecured Creditors of TOUSA, on behalf of the estate of TOUSA, later filed an adversary proceeding against the New Lenders and the Transeastern Lenders to avoid as a fraudulent transfer, see 11 U.S.C. § 548(a)(1)(B), the transfer of the liens to the New Lenders and to recover the value of the liens from the Transeastern Lenders, see 11 U.S.C. § 550(a)(1). The Committee alleged that the transfer of the liens by the Conveying Subsidiaries to the New Lenders was a fraudulent transfer under

6

section 548(a)(1)(B) because the Conveying Subsidiaries were insolvent when the transfer occurred, were made insolvent by the transfer, had unreasonably small capital, or were unable to pay their debts when due; and the Conveying Subsidiaries did not receive reasonably equivalent value in exchange for their transfer. See 11 U.S.C. § 548(a)(1)(B). The Committee demanded that the bankruptcy court avoid the liens and order the Transeastern Lenders, as the entities "for whose benefit" the transfer was made, 11 U.S.C. § 550(a)(1), to disgorge the proceeds of the loans.

The Transeastern Lenders and New Lenders responded that the transfer of the liens was not fraudulent because the Conveying Subsidiaries had received reasonably equivalent value in exchange for their liens. The Transeastern Lenders and New Lenders highlighted numerous purported benefits of the transaction, but the crucial source of alleged value for the Conveying Subsidiaries was the economic benefit of avoiding default and bankruptcy. The Transeastern Lenders and New Lenders contended that the Transeastern Lenders were likely to secure a judgment against TOUSA, which would have constituted an event of default on more than $1 billion of debt that the Conveying Subsidiaries had guaranteed. The default would have likely forced TOUSA and the Conveying Subsidiaries into bankruptcy. The transaction staved off this event and gave TOUSA and the

7

Conveying Subsidiaries an opportunity to continue as an enterprise and possibly become profitable again. The Transeastern Lenders and New Lenders contended that this opportunity was reasonably equivalent in value to the obligations the Conveying Subsidiaries incurred. The Transeastern Lenders and New Lenders also argued that the Conveying Subsidiaries received numerous other benefits, including a higher debt ceiling on the revolving loan, new tax benefits, the elimination of adverse business effects from the Transeastern litigation, and the opportunity to retain access to various centralized services provided by TOUSA such as cash management, purchasing, and payroll administration. The Transeastern Lenders argued alternatively that, if the transfer of liens was fraudulent, they could not be liable as entities for whose benefit the transfer was made because they were subsequent transferees of the loan proceeds from TOUSA, not entities that benefitted immediately from the transfer. See 11 U.S.C. § 550(a)(1).

After a 13-day trial, during which the bankruptcy court heard extensive fact and expert testimony and admitted over 1800 exhibits, the bankruptcy court issued its findings of fact and conclusions of law. See Official Committee of Unsecured Creditors of Tousa, Inc., v. Citicorp North America, Inc., (In re TOUSA, Inc.), 422 B.R. 783 (Bankr. S.D. Fla. 2009). The bankruptcy court found that the Conveying

Subsidiaries were unable to pay their debts when due, had unreasonably small capital, and were insolvent before and after the transaction; that the Conveying Subsidiaries did not receive value reasonably equivalent to the $403 million of obligations they incurred; and that the Transeastern Lenders were entities for whose benefit the Conveying Subsidiaries granted liens to the New Lenders.

The bankruptcy court credited expert opinion testimony that the Conveying Subsidiaries were insolvent both before and after the transaction of July 31, 2007. Experts in real estate value, public accounting, and insolvency examined the financial records of TOUSA and the Conveying Subsidiaries and concluded that the liabilities of each of the Conveying Subsidiaries exceeded the fair value of their assets before the transaction. The bankruptcy court found that the Conveying Subsidiaries became even more deeply insolvent after incurring additional debt through the transaction. The bankruptcy court also credited expert opinion testimony that, after the transaction, the Conveying Subsidiaries had unreasonably small capital and were unable to pay their debts as they came due.

The bankruptcy court then assessed whether the Conveying Subsidiaries received reasonably equivalent value from the transaction. The bankruptcy court first noted that "value" is defined in section 548 as being "property" or "satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C.

§§ 548(a)(1)(B)(i), (d)(2)(A).  The bankruptcy court determined that "the Conveying Subsidiaries could not receive 'property' unless they obtained some kind of enforceable entitlement to some tangible or intangible article."  In re TOUSA, 422 B.R. at 868 n.55.  Under this definition of "value," the bankruptcy court found that, because the Conveying Subsidiaries did not receive any property, they did not receive reasonably equivalent value.

The bankruptcy court also issued alternative findings in which it assessed the value the Conveying Subsidiaries received under the broadest definition of "value" proposed by the Transeastern Lenders and New Lenders.  The bankruptcy court found that, even if all the benefits highlighted by the Transeastern Lenders and New Lenders were legally cognizable, their value "considered . . . as a whole, . . . f[e]ll[] well short of 'reasonably equivalent' value."  Id. at 869.  The bankruptcy court determined the value the Conveying Subsidiaries lost in the transaction and compared that value with the value of the benefits they received.  The bankruptcy court determined that the tax benefits, property, and services that the Transeastern Lenders and New Lenders proffered did not provide reasonably equivalent value to the Conveying Subsidiaries.  The bankruptcy court also found that the transaction could not have provided substantial value predicated on the opportunity to avoid bankruptcy because the filing of bankruptcy became

10

"inevitable." Id. at 846. The bankruptcy court credited the expert opinion testimony of an accountant who had calculated that the Conveying Subsidiaries had incurred $403 million of obligations when they granted liens to help secure $500 million of loans from the New Lenders.

The bankruptcy court found that the alleged benefits of the transaction were insubstantial. The Transeastern Lenders and New Lenders alleged that one of the Conveying Subsidiaries received control of property from the Transeastern venture, but the bankruptcy court found that the property was worth only $28 million and was burdened with $32 million in liabilities in accounts payable and customer deposits. The bankruptcy court refused to credit the property as value. The bankruptcy court also rejected the argument of the Transeastern Lenders and New Lenders that the Conveying Subsidiaries received valuable tax benefits from the transaction. The Transeastern Lenders and New Lenders argued that losses on the Transeastern venture could reduce past and future tax liability, but the bankruptcy court found that the Conveying Subsidiaries received no benefits because the benefits would accrue to TOUSA, not the Conveying Subsidiaries, and all of the substantial loss-generating events that ostensibly arose from the transaction would have accrued without the transaction. The Transeastern Lenders and New Lenders argued that the Transeastern litigation had negative effects on

11

the day-to-day business operations of the Conveying Subsidiaries and that the July 31 transaction conferred an indirect benefit on the Conveying Subsidiaries by eliminating those effects, but the bankruptcy court found that those arguments were unsupported by the evidence. The bankruptcy court also found that the purported benefits of continued access to TOUSA corporate services, such as purchasing and payroll administration, were not received by the Conveying Subsidiaries in exchange for their liens because the Conveying Subsidiaries enjoyed all of these benefits before the transaction and continued to enjoy the corporate services even after TOUSA filed for bankruptcy. The bankruptcy court rejected the arguments of the Transeastern Lenders and New Lenders that the Conveying Subsidiaries obtained value because the transaction allowed the Conveying Subsidiaries access to an enhanced revolving credit facility. The Transeastern Lenders and New Lenders asserted that, when TOUSA acquired assets from the Transeastern Joint Venture, the borrowing limit on the revolving loan increased, but the bankruptcy court found that there was no evidence that the Conveying Subsidiaries had any need for a higher borrowing limit on the revolving loan.

The bankruptcy court found that an earlier bankruptcy for TOUSA would not have seriously harmed the Conveying Subsidiaries. Two experts testified that

12

a TOUSA bankruptcy would not necessarily have caused the Conveying Subsidiaries to declare bankruptcy because they held 95 percent of the assets of the TOUSA enterprise, which they could have used to obtain new financing. The bankruptcy court credited this testimony and found that Conveying Subsidiaries would not have been forced into bankruptcy by a TOUSA bankruptcy. The bankruptcy court also found that the Conveying Subsidiaries could have operated as independent entities without the services provided by TOUSA.

The bankruptcy court found that "even assuming that <u>all</u> of the TOUSA entities would have spiraled immediately into bankruptcy without the July 31 Transaction, the Transaction was <u>still</u> the more harmful option." <u>Id.</u> at 847. The bankruptcy court found that bankruptcy for the Conveying Subsidiaries was "inevitable" if TOUSA executed the transaction, <u>id.</u> at 846, so the transaction could not have conferred value by giving the Conveying Subsidiaries an opportunity to avoid bankruptcy. The bankruptcy court found that the management and controlling shareholders at TOUSA decided to risk hundreds of millions of dollars of their creditors' money despite the impending disaster the company faced.

These findings by the bankruptcy court were supported by public data and internal analyses and communications from TOUSA insiders that showed that the

13

transaction would almost certainly fail to keep TOUSA and the Conveying Subsidiaries out of bankruptcy. By the end of 2006, it was clear that TOUSA was liable to the Transeastern Lenders for defaults on the joint venture, but the extent of that liability and whether TOUSA could pay back its creditors and, if so, how quickly, were still in doubt. Internal documents revealed that TOUSA insiders realized that the liability of the company to the Transeastern Lenders could force TOUSA into bankruptcy. Lehman Brothers prepared a bankruptcy waterfall analysis for TOUSA in February 2007. David Kaplan, a senior financial advisor to the CEO of TOUSA, suggested in early 2007 that the company needed a Chief Restructuring Officer. On April 15, 2007, Larry Young, an advisor to TOUSA from AlixPartners LLP, wrote to Stephen Wagman, the CFO of TOUSA, "[W]hy rush to restructure in a down market with a bad set of terms just to file in 3 months. If we need to file due to the lenders/shareholder issues, then lets [sic] do it now and save ourselves about $50 million in transaction cost!" Wagman agreed with the assessment. On May 1, 2007, Kaplan sent Tony Mon, the CEO of TOUSA, a financial analysis of TOUSA that acknowledged the declining housing markets and stated, "[A]lthough we can agree to pay Creditors in full and with interest if payments are postponed, we cannot afford to pay them cash up front."

Mon and Wagman both argued that TOUSA should pay part of the

settlement with an infusion of equity to avoid taking on more debt. Both were concerned that increased debt from the settlement could severely constrain the company. Notes on a Mon's draft presentation to the Board warned, "[W]e must build in the capacity in this model so that when the market does turn, we have access to capital to build/sell product. If we can't do this, we are toast." In April of 2007, Mon sent information to a financial advisor of the controlling shareholders stating that the settlement would leave TOUSA with excessive debt; that post-settlement TOUSA would have limited access to the capital it would need to grow its business; and that the ability of TOUSA to escape from under its debt could be inhibited by significant risks including further deterioration in the housing market, falling land and home values, and further weakening in credit markets. Wagman likewise urged the controlling shareholders to consider a settlement that would include little or no new debt for TOUSA.

Despite the obvious risks posed by taking on more debt during a housing market decline, the controlling shareholders of TOUSA, the Stengos family, opposed any settlement deal that diluted their equity position. They directed Mon to terminate discussions with potential investors until new financing and the Transeastern settlement closed. Due to constraints imposed by the Stengos family, TOUSA decided to fund the settlement solely with new debt. The deal would

make TOUSA the most highly-leveraged company in the industry.

In the months preceding the July 31 closing of the transaction, public and private assessments made clear that the financial position of TOUSA was moving, as one securities analyst wrote, "from bad to worse." Investors recognized the dire straits that TOUSA faced, as evidenced by the drop in TOUSA stock prices from a high of $23 per share in 2006 to just $4 per share by April 2007. TOUSA bonds traded at discounts of 30 to 40 percent of face value in May 2007. After TOUSA presented the proposed July 31 transaction to ratings agencies, its corporate credit rating dropped.

In the same period, the national housing market was fast approaching collapse. On May 29, 2007, Mon and other TOUSA executives received a report that Standard and Poor's had downgraded the bond ratings on several major homebuilders from stable to negative. On June 6, 2007, TOUSA executives received a report that the National Association of Realtors was predicting that prices of new homes would fall 2.3 percent, and prices of existing homes would fall 1.3 percent. Mon forwarded the report to the Board and noted, "FYI, this represents [ ] the first time in 40 years that the US median home prices have declined."

TOUSA management recognized the implications of this financial news for

16

the proposed settlement. In an email to himself on May 25, 2007, Wagman noted that the outlook of the rating agencies for the homebuilding industry was "grim and getting grimmer," with downward pressure on prices and margins. He expressed his concerns about the precarious financial position of TOUSA and the proposed settlement in especially colorful language that would prove prophetic: "As CFO, and in light of all of this market uncertainty, I have absolutely no desire to fly this plane too close to the ground, achieve some from [sic] of consensual settlement today and crash within the upcoming year. That would be a clusterfuck." In an email to the Board on June 14, 2007, Mon stated that the company had not anticipated the degree to which problems in the subprime mortgage segments were spreading to less risky mortgage segments. Mortgage lenders began to implement more restrictive underwriting practices for residential mortgage loan applications, demand higher interest rates, and revoke commitments to homebuyers. These developments, Mon observed, "could have a cascading effect down the line." Mon told the Board, "this housing correction is far from over." At the Board meeting on June 20, 2007, at which the Board approved the July 31 transaction, Mon informed the Board that the U.S. housing market was at its lowest point since 1991.

On June 22, 2007, Mon sent the Stengos family's financial advisor a memo

entitled "Strategic Alternatives," which began by acknowledging that "[t]he TE settlement leaves TOUSA in a very difficult position." Post-transaction TOUSA would be "[o]ver-leveraged," "[w]ithout access to the capital markets," "[i]n the middle of a serious housing correction," "[f]orced to reduce assets at the 'wrong time,'" "[i]n need of a significant equity infusion," and "[u]nable to survive should housing conditions degrade further or the housing correction lengthen appreciably." Mon's memorandum predicted that a "Stay the Course" strategy—even when coupled with the company's de-leveraging plan—would leave TOUSA unable to service its $1 billion of bond debt, at a "competitive disadvantage," with "[c]apital [c]onstraints" that would allow "[b]arely enough 'oxygen' to survive," "[l]ittle room for error; increased risk of crashing and burning," "[l]imited ability to re-invest in the business," and "[a]lways on the brink of default." The "[e]nd [r]esult" of the strategy, Mon acknowledged, would be "[i]ncreased risk of failure and inability to withstand worsening business conditions."

The bankruptcy court found that Mon reached these dire conclusions before the June 20 Board meeting at which the transaction was approved. Mon exchanged a substantially identical version of the memo with Tommy McAden, then an executive vice president of TOUSA and President of the Transeastern

18

Joint Venture, as early as June 17, 2007. The bankruptcy court found that "[a] more complete and prescient prediction (that the effect of the Transeastern transaction would be to leave TOUSA with unreasonably small capital) would be hard to imagine." In re TOUSA, 422 B.R. at 795.

In the six weeks between Mon's assessment that the transaction would leave TOUSA "[u]nable to survive should housing conditions degrade further" and the closing of the July 31 transaction, housing conditions unquestionably degraded further. On June 27, 2007, Mon advised the Board that Lennar, a national home builder based in Miami, reported a "very ugly quarter" with "more ugliness to come" as "housing markets . . . continued to deteriorate." Mon testified that "throughout the summer we continued to see a downward slope in the housing market." On July 9, 2007, Mon sent the Board copies of articles from Barron's and The Wall Street Journal that Mon described as providing "un-relenting negative news on housing." Barron's foresaw that home sales volume would decline another 20 to 25 percent. The Wall Street Journal reported that declining home prices would increase impairments for homebuilders and decrease their book values "for the foreseeable future." By late July 2007, McAden described the Florida homebuilding market as having gone from the "hottest market" to being "at the bottom," with the worst yet to come for Southwest Florida.

Financial reports from TOUSA revealed the effects the housing downturn was having on the company. TOUSA sales in the first quarter of 2007 plunged more than 16 percent from the comparable quarter the previous year, the number of homes in development fell more than 20 percent, and its profit margin declined. The crash continued in the second quarter. On July 12, 2007, TOUSA notified investors that its deliveries and sales dropped 15 percent, homes under construction fell 29 percent year over year, the cancellation rate on sale contracts rose to 33 percent, and profit margins continued to fall. Internal financial reporting showed similar declines from the prior year.

Numerous analysts, ratings agencies, and market participants recognized that TOUSA was deeply troubled. On May 16, Debtwire reported that TOUSA bondholders had warned that the company would be entering the "zone of insolvency" if it took on new debt to settle with the Transeastern Lenders, and that some creditors of TOUSA "believe[d] that the proposed settlement could force the company into an eventual bankruptcy." In July 2007, ratings agencies Moody's and Standard & Poor's both downgraded their ratings of TOUSA bonds in contemplation of the July 31 transaction, concluding that TOUSA was "not likely" to be able to meet its financial obligations. By July 31, 2007, unsecured TOUSA bonds were selling at discounts as low as $0.45 on the dollar.

The bankruptcy court also found that the syndication process for the new loans in the transaction reflected the perilous position of TOUSA. As the housing sector and TOUSA continued their decline, the syndication market for the new loans became "[m]ore challenging," and the cost of the transaction loans to TOUSA increased. At least as early as July 24, lenders were dropping out of the deal. One of the lead bankers on the deal for Citicorp, Svetoslav Nikov, informed his colleagues that they were losing syndicate participants, and "[t]hings were looking ugly out there." Marni McManus, the Citicorp engagement leader, described leaving "panicky" messages about the deal as the market got worse. In a July 24 email to TOUSA management, McManus urged TOUSA to be prepared to close the loan deals soon because "the [market] has completely dried up," and "[t]he market is going from horrendous to worse." Nearly half of the prospective lenders for the First Lien Term Loan dropped out of the deal in the four days preceding July 31. Citicorp had to provide significant pricing incentives for the lenders, which raised borrowing costs for TOUSA. The final group of New Lenders included some firms that were lenders on the Transeastern debt that the new loans paid off. Through the transaction, these lenders essentially converted their unsecured loans to the Transeastern Joint Venture into secured loans to TOUSA and the Conveying Subsidiaries.

The bankruptcy court avoided the transfer as fraudulent under section 548 and held that the Transeastern Lenders were "entities for whose benefit" the liens were transferred.  See 11 U.S.C. § 550(a)(1).  The bankruptcy court held that, under controlling precedent and the plain language of section 550(a)(1), the "Transeastern Lenders directly received the benefit of the Transaction and the Transaction was undertaken with the unambiguous intent that they would do so." In re TOUSA, 422 B.R. at 870.  The bankruptcy court avoided the liens on the assets of the Conveying Subsidiaries and ordered the Transeastern Lenders to disgorge $403 million and prejudgment interest for the period between July 31, 2007, and October 13, 2009.  From the disgorged funds, the court awarded the Committee damages to cover the transaction costs related to the consummation of the July 31 transaction; the costs the debtors and the Committee incurred in the prosecution of the adversary proceeding, including fees and expenses paid to attorneys, advisors, and experts; and the diminution in the value of the liens between July 31, 2007, and October 13, 2009.  The bankruptcy court held that the Committee was entitled to the diminution in the value of the liens because "if the court limits the Trustees to recovery of the property itself, and if the property has declined in value, the estate will have lost the opportunity to dispose of the property prior to its depreciation."  Id. at 883 (quoting Feltman v. Warmus (In re

22

<u>Am. Way Serv. Corp.)</u>, 229 B.R. 496, 532 (Bankr. S.D. Fla. 1999).  The

bankruptcy court ordered that the remaining funds be distributed to the First and

Second Lien Lenders.  Because the settlement the Transeastern Lenders had

reached with TOUSA had been undone, the bankruptcy court restored the

unsecured claims of the Transeastern Lenders against TOUSA and its partner in

the joint venture.

*C. District Court Proceedings*

The Transeastern Lenders and the First and Second Lien Lenders appealed,

and their cases were assigned to three separate district court judges.  After a series

of transfers, five appeals by the Transeastern Lenders were assigned to one judge

and four appeals by the New Lenders were assigned to another judge.  This appeal

arises from the five appeals by the Transeastern Lenders.

The district court issued an order quashing the bankruptcy court decision as

it related to the liability of the Transeastern Lenders.  <u>3V Capital Master Fund Ltd.</u>

<u>v. Official Comm. of Unsecured Creditors of TOUSA, Inc.</u>, 444 B.R. 613, 680

(S.D. Fla. 2011).  The district court held that, as a matter of law, the bankruptcy

court had too narrowly defined "value."  The district court cited a Third Circuit

decision that held that "[t]he mere 'opportunity' to receive an economic benefit in

the future constitutes 'value' under the Code."  <u>Mellon Bank, N.A. v. Official</u>

23

Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.), 92 F.3d 139, 148 (3d Cir. 1996).  The district court also relied on a decision of the Eighth Circuit that explained that the correct way to determine "value" was not to define it "only in terms of tangible property or marketable financial value," but instead to "examine[] all aspects of the transaction and carefully measure[] the value of all benefits and burdens to the debtor, direct or indirect, including 'indirect economic benefits.'"  United States v. Crystal Evangelical Free Church (In re Young), 82 F.3d 1407, 1415 (8th Cir. 1996) (internal quotation marks omitted) vacated on other grounds, 521 U.S. 1114, 117 S. Ct. 2502 (1997).  The district court also cited a decision by our Court that stated that Section 548(a) "does not authorize voiding a transfer which 'confers an economic benefit upon the debtor,' either directly or indirectly."  GE Credit Corp. v. Murphy (In re Rodriguez), 895 F.2d 725, 727 (11th Cir. 1990) (citing Rubin v. Mfr. Hanover Trust Co., 661 F.2d 979, 991 (2d Cir. 1981)); see also 5 Collier On Bankruptcy ¶ 548.05, at 548–67 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2006) ("The nature of the value that is received need not be a tangible, direct economic benefit. An indirect economic benefit can suffice, so long as it is 'fairly concrete.'").  The district court concluded that indirect benefits, including the opportunity to avoid bankruptcy, could constitute "value" under section 548(a).

The district court then determined that the bankruptcy court clearly erred when it found that the Conveying Subsidiaries had not received reasonably equivalent value from the transaction. The district court found that the transaction gave the Conveying Subsidiaries the opportunity to avoid bankruptcy, continue as going concerns, and make further payments to their creditors. The district court found that these benefits did not need to be quantified to establish reasonably equivalent value. "Inherently, these benefits have immense economic value that ensure the debtor's net worth has been preserved, and, based on the entirety of this record, were not disproportionate between what was given up and what was received." In re TOUSA, 444 B.R. at 666.

The district court also held that the Transeastern Lenders could not, as a matter of law, be liable as "entities for whose benefit" the transfers were made because they did not benefit from the transfer of the liens to the New Lenders within the meaning of section 550(a)(1). The district court held that the Transeastern Lenders were subsequent transferees of the proceeds backed by the liens, not immediate beneficiaries of the transfer of the liens, and that subsequent transferees are not covered by section 550(a)(1). See id. at 674.

Finally, the district court held that remand was unnecessary because "the record allows only one resolution of the factual issues at stake," id. at 680, and

25

because the Transeastern Lenders made "compelling arguments" regarding the ability of the bankruptcy court "to approach the Defendant's evidence and arguments fairly." Id. at 679 n.65. The district court quashed the order of the bankruptcy court and declared all the proceedings regarding the Transeastern Lenders closed.

Because the district court ruled on issues that were central to the separate appeals of the New Lenders, the district court allowed the New Lenders to intervene in this appeal, and the district court stayed the appeals of the New Lenders pending disposition of this appeal.

## II. STANDARDS OF REVIEW

As the second court to review the judgment of the bankruptcy court, we review the order of the bankruptcy court independently of the district court. Westgate Vacation Villas, Ltd. v. Tabas (In re Int'l Pharmacy & Disc. II, Inc.), 443 F.3d 767, 770 (11th Cir. 2005). We review determinations of law made by either court de novo. Id. We review the findings of fact of the bankruptcy court for clear error. Id. The factual findings of the bankruptcy court are not clearly erroneous unless, in the light of all the evidence, "we are left with the definite and firm conviction that a mistake has been made." Id. "Neither the district court nor this Court is authorized to make independent factual findings; that is the function of

26

the bankruptcy court." Equitable Life Assurance Soc'y v. Sublett (In re Sublett), 895 F.2d 1381, 1384 (11th Cir. 1990). We review equitable determinations of the bankruptcy court for abuse of discretion. Bakst v. Wetzel (In re Kingsley), 518 F.3d 874, 877 (11th Cir. 2008).

## III. DISCUSSION

We divide our discussion into three parts. We first explain that the bankruptcy court did not clearly err when it found that the Conveying Subsidiaries did not receive reasonably equivalent value in exchange for their liens. We then explain that the bankruptcy court did not err when it found that the Transeastern Lenders were entities for whose benefit the liens were transferred. Finally, we explain why we will not consider, in the first instance, challenges to the remedies imposed by the bankruptcy court or issues of judicial assignment or consolidation of proceedings.

*A. The Bankruptcy Court Did Not Clearly Err When It Found That the Conveying Subsidiaries Did Not Receive Reasonably Equivalent Value in Exchange for the Liens They Transferred to the New Lenders.*

The Committee argues that the bankruptcy court did not clearly err when it found that the conveyance of the liens by the Conveying Subsidiaries to the New Lenders was a fraudulent transfer. Section 548(a)(1)(B) of the Bankruptcy Code provides for the avoidance of "any transfer . . . of an interest of the debtor in

27

property, or any obligation . . . incurred by the debtor, that was made or incurred . . . within two years before the date of the filing" of the bankruptcy petition, if the debtor "received less than reasonably equivalent value in exchange for" the transfer or obligation, and the debtor (1) "was insolvent on the date such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;" (2) "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;" or (3) "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B). The parties do not dispute, in this appeal, that the Conveying Subsidiaries were either insolvent, had unreasonably small capital, or were unable to pay their debts when the liens were conveyed. Their dispute concerns whether the Conveying Subsidiaries received less than reasonably equivalent value. "The purpose of voiding transfers unsupported by 'reasonably equivalent value' is to protect creditors against the depletion of a bankrupt's estate." G.E. Credit Corp. v. Murphy (In re Rodriguez), 895 F.2d 725, 727 (11th Cir. 1990).

The bankruptcy court endorsed a definition of "value" that the district court rejected as too narrow and potentially "inhibitory of contemporary financing

28

practices," In re TOUSA, 444 B.R. at 659, but we need not adopt the definition of either court. We decline to decide whether the possible avoidance of bankruptcy can confer "value" because the bankruptcy court found that, even if all the purported benefits of the transaction were legally cognizable, they did not confer reasonably equivalent value. See In re TOUSA, 422 B.R. at 869. Because these findings are not clearly erroneous, they settle this matter.

The bankruptcy court was entitled to find that the benefits of the transaction were not reasonably equivalent in value to what the Conveying Subsidiaries surrendered. "It has long been established that '[w]hether fair consideration has been given for a transfer is 'largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts.'" Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.), 904 F.2d 588, 593 (11th Cir. 1990) (quoting Mayo v. Pioneer Bank & Trust Co., 270 F.2d 823, 829–30 (5th Cir.1959) (Wisdom, J.)). The record supports the finding by the bankruptcy court that, for the Conveying Subsidiaries, the almost certain costs of the transaction of July 31 far outweighed any perceived benefits.

The Transeastern Lenders and New Lenders argue that the transaction of July 31 allowed the Conveying Subsidiaries to escape the "existential threat" of the likely bankruptcy that would ensue and that this chance to avoid bankruptcy

was a benefit reasonably equivalent in value to the obligations the Conveying Subsidiaries incurred, but we are unpersuaded that the record compels that finding. "A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it." Bloor v. Dansker (In re Investors Funding Corp. of New York Sec. Litig., 523 F. Supp. 533, 541 (S.D.N.Y. 1980). In other words, not every transfer that decreases the odds of bankruptcy for a corporation can be justified. The bankruptcy court considered the potential benefits of the transaction and found that they were nowhere close to its expected costs. In the light of all the evidence, we are not "left with the definite and firm conviction that" the bankruptcy court clearly erred. In re Int'l Pharmacy & Disc. II, Inc., 443 F.3d at 770.

The Transeastern Lenders and New Lenders argue that the record establishes that an adverse judgment in the Transeastern litigation would have caused TOUSA to file for bankruptcy, the revolving financing for the Conveying Subsidiaries to disappear, and the Conveying Subsidiaries to become liable for immediate payment of more than $1.3 billion to the revolving loan lenders and TOUSA bondholders. They contend that the bankruptcy court clearly erred when it found that the Conveying Subsidiaries could have survived a TOUSA bankruptcy. They argue that the bankruptcy court found that the Conveying

30

Subsidiaries were insolvent before the transaction, and they argue that it is unlikely that the insolvent Conveying Subsidiaries could have obtained new financing. They also argue that the absence of standalone financial statements was a "clear obstacle" to new financing. They highlight that one of the experts for the Committee described the intercompany payables and receivables for TOUSA and the Conveying Subsidiaries as a "huge pile of tangled spaghetti." The Transeastern Lenders and New Lenders assert that it would have taken months, if not years, to sort through the mound of records, which proves that the Conveying Subsidiaries had no chance to receive standalone financing.

The bankruptcy court found this evidence to be irrelevant because, "even assuming that all of the TOUSA entities would have spiraled immediately into bankruptcy without the July 31 Transaction, the Transaction was still the more harmful option." In re TOUSA, 422 B.R. at 847. "[A]t most it delayed the inevitable." Id. at 846. The bankruptcy court found that the benefits to the Conveying Subsidiaries were not close to being reasonably equivalent in value to the $403 million of obligations that they incurred. The Transeastern Lenders and New Lenders attack this finding as "hindsight reasoning . . . at its most extreme," but the bankruptcy court based its extensive findings on a thorough review of public knowledge available before July 31, 2007; expert analysis of data available

31

before July 31, 2007; and statements by TOUSA insiders made before July 31, 2007.

The Transeastern Lenders and New Lenders argue that the finding of an "inevitable" bankruptcy is against the weight of the evidence, but the only evidence they cite, in contrast with the thorough findings of the bankruptcy court, are the opinions of a TOUSA advisor that the company would remain viable after the transaction and statements from Tony Mon about a comprehensive strategy to shrink TOUSA after the transaction, shore up its finances, and rebuild the company. The Transeastern Lenders and New Lenders contend that the projections of TOUSA look unreasonable now only because weeks after the transaction, "a tragic global financial crisis of unprecedented proportions" began. They assert that the unexpected downturn was described by Alan Greenspan as "a once in a century credit tsunami" and by Warren Buffett as an "economic Pearl Harbor." The Transeastern Lenders and New Lenders argue that they cannot be held liable for failing to foresee the unforeseeable, that their actions were reasonable, and that the bankruptcy court clearly should have found that the transaction was a reasonable risk for the Conveying Subsidiaries to take.

The record supports a determination that the bankruptcy of TOUSA was far more like a slow-moving category 5 hurricane than an unforseen tsunami. The

bankruptcy court considered the evidence from outside advisors to TOUSA and found much of it suspect or based on faulty premises. The bankruptcy court considered and discounted Mon's deleveraging strategy for TOUSA in the light of the dire predictions he and other insiders made regarding the effects the transaction would have on TOUSA. And the bankruptcy court found that, even though Alan Greenspan and Warren Buffet could not foresee the general economic downturn that began in earnest in August 2007, numerous external observers and insiders at TOUSA recognized that the relevant housing markets for TOUSA had begun their free fall before the July 31 transaction. In contrast with the surprise attack at Pearl Harbor, the warnings about the collapse of TOUSA made that event as foreseeable as the bombing of Nagasaki after President Truman's ultimatum.

The opportunity to avoid bankruptcy does not free a company to pay any price or bear any burden. After all, "there is no reason to treat bankruptcy as a bogeyman, as a fate worse than death." Olympia Equipment Leasing Co. v. Western Union Telegraph Co., 786 F.2d 794, 802 (7th Cir. 1986) (Easterbrook, J., concurring). The bankruptcy court correctly asked, "based on the circumstances that existed at the time the investment was contemplated, whether there was any chance that the investment would generate a positive return." See Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L.,

33

Inc.), 92 F.3d 139, 152 (3rd Cir. 1996). And the record supports the negative answer found by the bankruptcy court.

*B. The Bankruptcy Court Did Not Err When It Ruled That the Committee Could Recover from the Transeastern Lenders under Section 550(a)(1).*

If a transfer is avoided under section 548 or one of several other provisions of the Bankruptcy Code, section 550(a)(1) allows the recovery of the property transferred or its value from the initial transferee or from an "entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1). Although the liens of the Conveying Subsidiaries were transferred to secure loans to pay the Transeastern Lenders, the Transeastern Lenders argue that they are not covered by section 550 because they were subsequent transferees, not entities that benefitted from the initial transfer. Their argument is contradicted by the loan agreements, which required that the proceeds of the loans secured by the liens be transferred to the Transeastern Lenders. Under the plain language of section 550(a)(1) and the precedent of our Court, the Transeastern Lenders are entities for whose benefit the Conveying Subsidiaries transferred their liens.

To be sure, we have stated that "the paradigm case of a benefit under § 550(a) is the benefit to a guarantor by the payment of the underlying debt of the debtor." Reily v. Kapila (In re Int'l Mgmt. Ass'n), 399 F.3d 1288, 1292 (11th Cir.

34

2005). The guarantor receives an immediate benefit when the debtor pays back a creditor, which reduces the liability of the guarantor. Although this relationship may be the paradigmatic case, it is not the only circumstance that can give rise to "for whose benefit" liability.

We have also held that a creditor similarly situated to the Transeastern Lenders can be liable as an entity for whose benefit a transfer was made. In American Bank of Marin County v. Leasing Service Corp. (In re Air Conditioning, Inc. of Stuart), 845 F.2d 293 (11th Cir. 1988), we ruled that section 550(a)(1) allowed the trustee to recover the value of a $20,000 certificate of deposit from the creditor of a company that had transferred a security interest in the certificate of deposit to a bank, which had transferred a $20,000 letter of credit to the creditor. Id. at 299. The company in Air Conditioning owed its creditor $20,000. Id. at 295. When the company began falling behind on payments, the parties worked out a deal to keep the company in business. Id. As part of the deal, the company issued a $20,000 promissory note to a bank secured by a $20,000 certificate of deposit. Id. The bank, in turn, executed a $20,000 letter of credit to the creditor. Id. After the company entered bankruptcy, we ruled that the transfer of the security interest in the certificate of deposit to the bank constituted an avoidable preference under section 547(b) because it was a transfer of property of the debtor

35

to a creditor within 90 days of filing for bankruptcy that provided more value to the creditor than it would have received under chapter 7 of the Bankruptcy Code. Id. at 296–97; see also 11 U.S.C. 547(b). We then ruled that the bankruptcy trustee could recover the value of the certificate of deposit from the creditor because the company granted the security interest to the bank for the benefit of the creditor. Id. at 299. We explained that the text of section 550(a)(1) allows the trustee to recover from a creditor when it was an entity for whose benefit the transfer of the certificate of deposit was made. Id.

Our decision in Air Conditioning controls this appeal. In Air Conditioning, the debtor transferred a lien to a lender who transferred funds to a creditor. The transfer of the lien was avoided and, under section 550(a)(1), the creditor was an entity for whose benefit the transfer was made. In the same way, the Conveying Subsidiaries transferred liens to the New Lenders, who transferred funds to creditors, the Transeastern Lenders. The bankruptcy court avoided the transfer of the liens and, under section 550(a)(1), the Transeastern Lenders were entities for whose benefit the transfer was made.

The Transeastern Lenders attempt to distinguish their appeal from Air Conditioning in two ways, but their arguments ignore the material similarities between the preference in that decision and the fraudulent transfer at issue in this

36

appeal. First, the Transeastern Lenders contend that <u>Air Conditioning</u> involved a preference under section 547 instead of a fraudulent transfer under 548, but "[t]he theory under which a transfer has been avoided is irrelevant to the liability of the transferee against whom the trustee seeks to recover [under section 550]." <u>Danning v. Miller</u>, 922 F.2d 544, 546 n.2 (9th Cir. 1991). Second, the Transeastern Lenders argue that section 550(a)(1) applied in <u>Air Conditioning</u> because a letter of credit was involved, but the Transeastern Lenders cannot provide a principled basis for limiting section 550(a)(1) to factual scenarios that involve letters of credit.

The Transeastern Lenders also contend that they cannot be liable under section 550(a)(1) because they benefitted from a subsequent transfer of funds from TOUSA, not from the initial transfer of the liens, but the record contradicts their assertion. The new loan agreements required that the loan proceeds be used to pay the Transeastern settlement, and the Transeastern settlement expressly depended on the new loans. When the liens were transferred to the New Lenders, the proceeds of the loans went to the Transeastern Lenders. The Transeastern Lenders assert that the funds passed from the New Lenders to a wholly-owned subsidiary of TOUSA before the funds were paid to the Transeastern Lenders, but the subsidiary that wired the money to the Transeastern Lenders did not have control

37

over the funds. The loan documents required the subsidiary to wire the funds to the Transeastern Lenders immediately. Although the funds technically passed through the TOUSA subsidiary, this formality did not make the Transeastern Lenders subsequent transferees of the funds because TOUSA never had control over the funds. See Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 848 F.2d 1196, 1199 (11th Cir. 1988) (stating that courts must apply a "very flexible, pragmatic" test that "look[s] beyond the particular transfers in question to the entire circumstance of the transactions" when deciding whether debtors had controlled property later sought by their trustees); Bonded Fin. Servs., 838 F.2d at 893 (holding that a bank was not an initial transferee because it held funds "only for the purpose of fulfilling an instruction to make the funds available to someone else").

The Transeastern Lenders warn that our reading of section 550(a) would drastically expand the potential pool of entities that could be liable for any transaction, but these concerns are unsubstantiated. The Transeastern Lenders offer examples of a parent company taking out a loan secured by its subsidiaries with the specific intent of paying a contractor to build a building for the parent company or paying the dry cleaning bill of the parent company. The Transeastern Lenders caution that the contractor or dry cleaner could be forced to return their

payments if the loan securing the money involved a fraudulent transfer, which would impose "extraordinary" duties of due diligence on the part of creditors accepting repayment. But every creditor must exercise some diligence when receiving payment from a struggling debtor. It is far from a drastic obligation to expect some diligence from a creditor when it is being repaid hundreds of millions of dollars by someone other than its debtor.

*C. We Remand for the District Court To Consider First the Remedies Imposed by the Bankruptcy Court and Matters of Assignment and Consolidation.*

The parties' remaining arguments pertain to issues that are not ripe for our review. The Transeastern Lenders ask that we vacate the remedies ordered by the bankruptcy court, and both parties ask that we wade into matters of judicial assignment and consolidation on remand. These issues must be resolved first by the district court.

The Transeastern Lenders challenge the remedies imposed by the bankruptcy court, but we will not address an issue that the district court has not yet considered. See e.g., Dzikowski v. Northern Trust Bank of Florida, N.A. (In re Prudential of Florida Leasing, Inc.), 478 F.3d 1291, 1303 (11th Cir. 2007) ("When the district court does not address an issue [it dismissed as moot], the proper course of action often is to vacate the order of the district court and remand.").

39

The district court, on remand, should review, in the first instance, the remedies ordered by the bankruptcy court. We express no opinion on that subject.

The parties' requests about judicial assignment and consolidation of proceedings are also misdirected. The Committee urges us to remand this case to a different district judge; and the Transeastern Lenders and New Lenders argue that, if the case needs to be heard again by the bankruptcy court, we should instruct the district court to remand the case to a different bankruptcy judge. Both sides complain that the judge who issued a decision unfavorable to their interests is biased, but neither side has established that "the original judge would have difficulty putting his previous views and findings aside." CSX Transp., Inc. v. State Bd. of Equalization, 521 F.3d 1300, 1301 (11th Cir. 2008). The Committee also argues that the remaining remedial issues are intertwined with remedial issues from a related appeal before a different district judge and that consolidation of proceedings would promote judicial economy. We leave these matters of future judicial administration and management for the district court to address first.

### IV. CONCLUSION

We **REVERSE** the order of the district court, **AFFIRM** the liability findings of the bankruptcy court, and **REMAND** to the district court for further proceedings consistent with this opinion.

40

**REVERSED AND REMANDED.**