[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14034
Non-Argument Calendar

_____

D.C. Docket Nos. 1:13-cv-00210-JRH-BKE; 11-bkc-01021-SDB

In Re: THOMAS J. MCFARLAND,

Debtor.

_____

A. STEPHENSON WALLACE,

Plaintiff-Appellee,

versus

THOMAS J. MCFARLAND,

Defendant-Appellant,

SHERRY H. MCFARLAND,

Defendant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(October 16, 2015)

Before JORDAN, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

This case concerns two primary questions: whether a debtor made a transfer of his interest in property to his non-debtor wife, and, if so, whether the bankruptcy trustee could avoid the transfer as fraudulent under 11 U.S.C. § 548(a)(1). The bankruptcy court answered "yes" to both questions, thereby bringing the property at issue within the bankruptcy estate. The debtor in this action, Thomas McFarland ("Thomas"), contends that the purported transfer did not convey his own interest but rather conveyed only bare legal title to an equitable interest held by his wife Sherry McFarland ("Sherry") since the property was purchased in 1968 and that the trustee failed to produce sufficient evidence that the transfer was fraudulent. After careful review, we affirm the bankruptcy court.

**I.**

*A.     Underlying Factual Background*

The factual background for this appeal is largely undisputed. Thomas and Sherry were married in 1968. Thomas was 26 years old at the time; Sherry was 19. Shortly after their marriage, the McFarlands, at Sherry's suggestion, decided to purchase the property at issue in this appeal, which consists of three parcels of land in Chatham County, Georgia (the "Property"). The Property was located near where Sherry grew up and where her parents lived, and Sherry had always wanted

to live in the area.  Thomas was from California and had no other connection to the area before marrying Sherry.

The Property was purchased for $15,000, financed with a $5,000 loan from Sherry's father, taken from a fund for Sherry's college education, and a $10,000 loan from Atlantic Savings and Trust.  The McFarlands repaid the loans from a joint bank account in which they both deposited their earnings.  Only Thomas's name appears on the documentation of the purchase, including the warranty deed, security deed, and the notes.  The McFarlands lived on the Property until 1970.

According to the McFarlands, the absence of Sherry's name from any of the purchase documentation reflected societal customs and practices of the era, as well as the "traditionalist" view of Sherry's father, who loaned a portion of the purchase price and was involved in the purchase.  They contend that, despite the way the documents were prepared, it was always their intention that the Property be jointly owned.  Nonetheless, legal title to the Property remained solely in Thomas's name until 2009, when Thomas executed the "Deed of Gift" at issue in his appeal.

The execution of the 2009 Deed of Gift was triggered by a personal-injury lawsuit, arising from a car accident, filed against Thomas in 2008.  Following an unsuccessful mediation of the lawsuit, Thomas became concerned that the plaintiff and her attorney were going to try to "ruin" him financially.  In his words, he executed the 2009 Deed to prevent the personal-injury plaintiff from pursuing what

he believed to be Sherry's one-half interest in the Property. According to Thomas, the purpose of the 2009 Deed was merely to correct legal title to the Property. The McFarlands stated that they did not see a reason to correct the legal records to the Property until the 2008 lawsuit, but they had discussed doing so before 2008.

The personal-injury lawsuit proceeded to a jury trial where the jury awarded the plaintiff approximately $1 million in damages against Thomas. Soon after judgment was entered against him, Thomas filed for bankruptcy protection under Chapter 7.

## B.    *Adversary Proceeding by Trustee to Set Aside the 2009 Deed of Gift*

After Thomas filed for bankruptcy, the bankruptcy trustee filed an adversary complaint against the McFarlands to avoid the 2009 Deed of Gift as a fraudulent transfer of property under 11 U.S.C. § 548(a)(1). The McFarlands responded to the complaint and asserted that Sherry's one-half interest in the Property could not be included within the bankruptcy estate because the 2009 Deed of Gift did not transfer any equitable title to the Property, but rather, merely corrected legal title to reflect Sherry's existing ownership of the Property.

The bankruptcy court held a bench trial at which both Thomas and Sherry testified. Following the trial, the court granted the trustee's action to set aside the transfer under § 548(a)(1)(A) or (B). *See generally Wallace v. McFarland*, (*In re McFarland)*, No. 11-1021, 2013 WL 5442406 (Bankr. S.D. Ga. Sept. 30, 2013).

4

The court explained that, in order to avoid the transfer, the trustee had to satisfy the burden to prove that the conveyance was made with actual intent to hinder, delay, or defraud a creditor, § 548(a)(1)(A) ("actual fraud"), or that the debtor did not receive "reasonably equivalent value" for the transfer and believed that he would incur "debts that would be beyond the debtor's ability to pay," § 548(a)(1)(B)(i) and (ii)(III) ("constructive fraud").

The bankruptcy court first determined the "threshold issue" that the 2009 Deed of Gift was a transfer of Thomas's own interest in the Property, not simply a recognition of Sherry's existing equitable interest.  Looking to Georgia state law, the court concluded that the evidence did not support the McFarlands' contention that Thomas had held a one-half interest in trust for Sherry by operation of an implied purchase money resulting trust or otherwise.  Therefore, according to the court, the one-half interest deeded to Sherry in the 2009 Deed of Gift was properly considered part of Thomas's bankruptcy estate under 11 U.S.C. § 541.

Next, the bankruptcy court determined that Thomas transferred the interest in the Property with actual fraudulent intent under § 548(a)(1)(A).  The trustee, according to the court, produced evidence of multiple "badges of fraud," *see, e.g.*, *Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1271-72 (11th Cir. 1998), including that Thomas transferred the Property to an "insider," his wife, that he did not receive reasonably equivalent value in exchange for the transfer, and

5

that the timing of the transfer was suspicious in that it occurred shortly after the failed mediation of the then-pending lawsuit.

The bankruptcy court went on to conclude that the trustee could also avoid the transfer as constructively fraudulent under § 548(a)(1)(B), because Thomas did not receive reasonably equivalent value, and he believed he would incur debts beyond his ability to pay.  The court found that Thomas did not receive any "value" in exchange for the transfer, let alone value that would be "reasonably equivalent" to the value of a one-half interest in the Property, given that Thomas valued his one-half interest at $350,000.00 in his bankruptcy schedules.  And the court determined that Thomas's belief that he would incur debts beyond his ability to pay was demonstrated by evidence of the following:  Thomas executed the 2009 Deed of Gift days after a failed mediation of a personal-injury lawsuit;  he knew that the plaintiff in that suit sustained extensive damages;  he believed that the plaintiff intended to "ruin" him financially;  and the Deed was admittedly executed for the purpose of protecting his wife's purported interest in the Property.

Finally, the bankruptcy court rejected Sherry's counterclaim, pursuant to 11 U.S.C. § 548(c).  Sherry had argued that she should be entitled to recover half of any proceeds realized from the trustee's sale of the Property because she was a good-faith transferee who took an interest in the Property for value.[1]

---

[1] The McFarlands do not contest the resolution of the § 548(c) claim on appeal.

6

The McFarlands appealed to the district court pursuant to 28 U.S.C. § 158(a)(1), and the court affirmed the bankruptcy court's order. Thomas now brings this appeal. We have jurisdiction under 28 U.S.C. § 158(d)(1).

## II.

As the second court of review in bankruptcy cases, we examine the judgment of the bankruptcy court independently of the district court. *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1310 (11th Cir. 2012). We review the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*. *Id.* A factual finding is not clearly erroneous unless, after reviewing all the evidence, we are "left with a definite and firm conviction that a mistake has been made." *Id.* (citation omitted).

## III.

The trustee's power to avoid fraudulent transfers or obligations derives from 11 U.S.C. § 548. Section 548(a)(1) provides, in pertinent part, as follows:

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the [bankruptcy] petition, if the debtor voluntarily or involuntarily—
>
> > (A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . . , indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer . . . ; and

. . . .

(ii)(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured[.]

Thus, the trustee may avoid a transfer either as actual fraud, under § 548(a)(1)(A), or as constructive fraud, under § 548(a)(1)(B).  Both parties agree that the trustee bears the burden of proving that a transfer is fraudulent under § 548(a)(1).  *See, e.g.*, *Sullivan v. Welsh (In re Lumbar)*, 457 B.R. 748, 753 (B.A.P. 8th Cir. 2011).

We divide our discussion into two parts.  First, we address the "threshold" issue of whether the 2009 Deed of Gift was a transfer of "an interest of the debtor in property," § 548(a)(1).  Concluding that the bankruptcy court did not err in determining that it was, we then proceed to the second question:  whether the bankruptcy court erred in concluding that the transfer was actually or constructively fraudulent.[2]

A.     *Transfer of an Interest of the Debtor in Property*

A debtor's estate in bankruptcy includes "all legal or equitable interests of the debtor in property as of the commencement of the case."   11 U.S.C. § 541(a)(1).  Section 541, however, excludes from the bankruptcy estate property

---

[2]  No dispute exists that the purported transfer occurred within two years of the filing of the petition.  *See* 11 U.S.C. § 548(a)(1).

in which the debtor holds only legal title and not an equitable interest. *Id.* § 541(d). By the same token, property the debtor holds only in trust for another is not an "interest of the debtor in property" under § 548(a)(1). *See Begier v. Internal Revenue Serv.*, 496 U.S. 53, 58-59 & n.3, 110 S. Ct. 2258, 2263 & n.3 (1990) (holding that property a debtor holds only in trust for another is not "an interest of the debtor in property" under 11 U.S.C. § 547(b), which authorizes the trustee to avoid certain preferential payments to creditors made before bankruptcy); *see also Bank of Am. v. Mukamai (In re Egidi)*, 571 F.3d 1156, 1160-61 (11th Cir. 2009); *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1180-81 (11th Cir. 1987) (discussing the similarities and differences between §§ 547 and 548 in other circumstances).

In other words, if the 2009 Deed of Gift conveyed only bare legal title to an interest Thomas held in trust for Sherry, as the McFarlands contend, it appears that there would have been no transfer of "an interest of the debtor," because Sherry's equitable interest would have been excluded from Thomas's bankruptcy estate.[3] *See* 11 U.S.C. § 541(a)(1) & (d).

The nature of a debtor's interest in property under § 541 is determined by state law. *Musolino v. Sinnreich (In re Sinnreich)*, 391 F.3d 1295, 1297 (11th Cir. 2004). Under Georgia law, trusts may be either express or implied. In general,

---

[3] The trustee does not contend that the interest would have been included in Thomas's bankruptcy estate on another basis.

"[t]rusts are implied whenever the legal title is in one person, but the beneficial interest, either from the payment of the purchase money or other circumstances, is either wholly or partially in another." *Bullard v. Bullard*, 103 S.E.2d 570, 572 (Ga. 1958). Implied trusts are either resulting or constructive. *Hall v. Higgison*, 149 S.E.2d 808, 810 (Ga. 1966). Resulting trusts are primarily a product of the parties' intent, whereas constructive trusts are an equitable remedy where there is fraudulent conduct. *Id.*

The McFarlands rely on two theories of implied trust: "purchase money resulting trust" and constructive trust.[4] We address each theory separately.

### 1. Purchase Money Resulting Trust

The McFarlands argue that the evidence before the bankruptcy court was sufficient to show that they intended to jointly own the Property at the time of purchase and that Sherry contributed sufficient consideration to establish a purchase money resulting trust. They also contend that the trustee failed to prove that Sherry did not own a joint interest in the Property and that the court absolved the trustee's evidentiary failures by improperly shifting the burden of proof to the McFarlands to show the existence of an implied trust.

---

[4] It is undisputed that Sherry did not obtain an equitable interest in the Property solely by virtue of marriage. *Miller v. Fulton Cnty.*, 375 S.E.2d 864, 865 (Ga. 1989) ("[N]o property rights are created in the assets of the marriage while the parties are still married.").

10

"A purchase money resulting trust is a resulting trust implied for the benefit of the person paying consideration for the transfer to another person of legal title to real or personal property."  O.C.G.A. § 53–12–131 (formerly codified at O.C.G.A. § 53–12–92); *see* O.C.G.A. § 53–12–130(3); *Dodd v. Scott*, 550 S.E.2d 444, 447 (Ga. Ct. App. 2001).  In order to establish a purchase money resulting trust, the party claiming the benefit of the trust must show either (1) that the party contributed purchase money at or before the time of purchase or (2) an agreement at the time of purchase for the party claiming the benefit to contribute purchase money so as to create a resulting trust.  *Thompson v. Bearden*, 453 S.E.2d 20, 21 (Ga. 1995) (quoting *Loggins v. Daves*, 40 S.E.2d 520 (Ga. 1946)).

Courts may consider all facts and circumstances surrounding the transaction to determine whether the parties intended a purchase money resulting trust.  O.C.G.A. § 53–12–133; *Harrell v. Harrell*, 290 S.E.2d 906, 907 (Ga. 1982).  An implied resulting trust must be proved by "clear and convincing evidence."  *Lee v. Lee*, 392 S.E.2d 870, 871-72 (Ga. 1990).

Here, both Sherry and Thomas testified during trial that they had no agreement for Sherry to contribute half of the purchase price.  (Trial Tr. at 21:24–22:11 & 54:18–55:2).  Therefore, while the McFarlands may have intended to jointly own the property, that intent does not equate to intent to create a purchase

11

money resulting trust.[5]  *See, e.g.*, *Bullard*, 103 S.E.2d at 573-74 (plaintiff's belief in joint ownership was insufficient to establish a purchase money resulting trust).

Turning to whether Sherry contributed consideration for the purchase of the Property, Georgia law provides that the party claiming the benefit of a purchase money resulting trust "must show with certainty what part of the total purchase price [she] paid."  *Brown v. Leggitt*, 174 S.E.2d 889, 891 (Ga. 1970); *Bullard*, 103 S.E.2d at 574 ("In order to establish an implied trust, it must be shown that some definite portion of the purchase price was furnished by the party claiming the trust.").  In general, the payment of consideration for the transfer of legal title to another person "create[s] a presumption in favor of a resulting trust, but such presumption shall be rebuttable by a preponderance of the evidence."  O.C.G.A. § 53–12–131(b).  However, where the payor of consideration and transferee of the property are husband and wife, the presumptions are flipped, and "a gift shall be presumed, but such presumption shall be rebuttable by clear and convincing evidence."  *Id.* § 53–12–131(c).[6]

---

[5]  Likewise, the third-party testimony that the McFarlands presented at trial supports their position that they believed the property was jointly owned but not that there was an agreement to create a purchase money resulting trust.

[6]  The presumption of a gift between spouses did not apply when the Property was purchased in 1968.  *See Woodward v. Woodward*, 266 S.E.2d 170, 171-72 (Ga. 1980) (holding that there was no presumption of a gift where the wife's money was used to make the purchase but title was placed in the name of the husband, and finding the facts sufficient to establish a purchase money resulting trust in favor of the wife).  But the code section relied on in *Woodward* was repealed in 1981, and the Supreme Court of Georgia has indicated that the presumption of a

12

On appeal, the McFarlands point to several pieces of evidence, which, they assert, establish Sherry's contribution of purchase money: (1) the $5,000 loan from Sherry's college fund; (2) Sherry's wage contributions to the joint account; and (3) payments Sherry made from the McFarlands's joint account while Thomas served in the U.S. Army in Vietnam.

We find that the bankruptcy court did not clearly err in finding that the $5,000 loan from Sherry's college-education fund was not money contributed by Sherry. While the loan would not have occurred but for Sherry, the record supports the court's findings that the money was loaned by Sherry's father with the expectation that the money would be repaid, that Sherry never received the money from the fund, and that Thomas was the only party obligated on the note.

We find, however, that the court erred in determining that Sherry's contributions to the McFarlands's joint account were "vague" and insufficient to establish with certainty what amount Sherry contributed to the purchase price. The testimony presented at trial demonstrated that Sherry held several minimum-wage jobs from 1968 to 1971 and that she earned about one-third of the McFarlands' total wages in 1968. Thomas testified that when the couple was first married, he

gift applies in all cases tried after 1981. *See Owens v. Owens*, 286 S.E.2d 25, 27 (Ga. 1982) (directing the trial court to apply the presumption of a gift on retrial, where the presumption did not apply when the case was first tried). Therefore, the bankruptcy court did not err in applying the presumption of a gift in this case.

13

made $150 per week as a salesman, and Sherry made $80 per week (minimum wage).  Thomas's pay rose significantly when he rejoined the Army late in 1969, but Sherry continued to earn at least minimum wage for the first three years of their marriage.  Sherry did not contribute any outside earnings to the couple's joint bank account from 1971 to 1989.[7]

Based on these facts, the bankruptcy court found that it was unclear how much of Sherry's wages were used to pay off the loans but that Sherry contributed "significantly less" than Thomas.  Although Sherry "cannot retrace all of her financial records from 1968 to calculate exactly the amount she paid," the record is clear that her wages earned during the first three years of marriage were used to re-pay the loans taken in order to purchase the Property.  The evidence also clearly established that between February 1968 and November 1969, when Thomas's pay increased an unknown amount, the McFarlands repaid at least $2,250 on the loan to Sherry's father.[8] During this period, Sherry contributed about $80 per week to the joint bank account, while Thomas deposited $150 per week.  On a *pro rata* basis, then, from February 1968 through November 1969, Sherry contributed at

---

[7]  The McFarlands had their first child in 1971, and Sherry raised their children and managed the assets of the family.

[8] The McFarlands testified that they repaid Sherry's father $50 per month after purchasing the Property in February 1968, except that in May and June 1969, they paid him $100 per month.

least $782.61 towards repayment of the loans on the Property.[9]   While we recognize that the decision in *Brown* suggests that Sherry would need to establish that the amount contributed by her was half of the purchase price, it does so in *dicta*. *See Brown*, 174 S.E.2d at 891.  This is not the holding in *Brown*.

Next, we conclude that that the bankruptcy court erred in finding that payments made on the loans by Sherry from the McFarlands' joint account while Thomas was serving overseas were not Sherry's contribution towards the purchase price but rather were Sherry's payment of Thomas's contribution.  Under Georgia law, "A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent."  O.C.G.A. § 7–1–812.  Thus, "the statute creates a presumption that one funding a joint account does not intend to make a gift of the funds of the account during life, although this presumption may be rebutted by clear evidence to the contrary."  *Parker v. Kennon*, 530 S.E.2d 527, 529-530 (Ga. Ct. App. 2000).  Authority to withdraw funds from a joint account does not equate to ownership of the funds.  *See id.*

---

[9] $80/(80 + 150) = x/2,250$.  This total does not include the amounts that Sherry contributed after November 1969, when Thomas's salary increased.  Because there is no evidence regarding the amount to which Thomas's salary increased in November 1969, we cannot on this record evaluate the minimum amount that Sherry must have contributed between that time and 1971, when Sherry stopped working outside the home.

15

Although we agree that the bankruptcy court did not err in determining that Sherry's access to and mere management of the funds in the joint account did not establish her contribution to the purchase of the Property, *see Parker*, 530 S.E.2d at 529-30, we conclude that the bankruptcy court did err when it concluded that the McFarlands failed to show by clear evidence that Thomas made a "gift" to Sherry of the money deposited in the joint account and used to make payments on the loans. During trial, Thomas testified with respect to his contribution to the couple's joint bank account as follows:

Q:    Once that money was in the (joint) account what restrictions, if any, did you put on the account that would have prevented your wife from spending money any way she saw fit?

A:    None.

Q:    And while you were in Vietnam, what restrictions did you have that would have prevented her from, say, maybe buying a car in her name instead of making payments on the land?

A:    None.

Q:    Was that also the case in 1971 when only your money was being deposited when she no longer had a salary?

A:    Yes, sir. . . .

Q:    Did you ever or what indications did you ever give to her that she couldn't use the money that you earned for any purpose she decided?

A:    Never.

Thomas's testimony regarding Sherry's ability to spend the funds in their joint account however she desired—even for her own personal benefit only—clearly established that the amounts deposited by him in the account were a gift to his wife.  The trustee emphasizes that nowhere in his testimony did Thomas specifically state that he intended his earnings to be a "gift" to Sherry.  But the fact that Thomas did not use the word "gift" during his testimony does not necessarily mean that he did not make a gift to his wife of the monies in their joint account while he was in Vietnam.  There is nothing magical about the word "gift"—it is the intent behind Thomas's actions that is significant.  Here, the evidence showed that Thomas intended to and in fact made a voluntary transfer of his financial property to Sherry.  *See Gift*, Black's Law Dictionary (10th ed. 2014).  Although O.C.G.A. § 7-1-812 creates a presumption that the person funding a joint account does not intend to make a gift of funds to the joint account holder, here, the record was sufficient to rebut that presumption.

Because the funds in the joint account constituted a "gift," any payment of the loan amount out of the account by Sherry was a payment made by her.  Typically, a purchase money resulting trust is implied for the benefit of the person paying consideration for the property.  *See* O.C.G.A. § 53-12-131(a).  But, as noted previously, where the payor of consideration and transferee of the property are husband and wife, "a gift shall be presumed, but such presumption shall be

17

rebuttable by clear and convincing evidence." *Id.* § 53–13–131(c). Accordingly, although we find that Sherry paid consideration for the Property, we must presume that any payment from the account on the Property were a gift to Thomas since the property was in his name alone, unless the couple can rebut this presumption by clear and convincing evidence.

We agree with the bankruptcy court that the McFarlands failed to present "clear and convincing" evidence to rebut the presumption that Sherry's contributions to the purchase of the Property were a gift to Thomas. *See* O.C.G.A. § 53-13-131(c); *Owens v. Owens*, 286 S.E.2d 25, 27 (Ga. 1982). Thus, the McFarlands did not prove the existence of an implied resulting trust by clear and convincing evidence. *See Lee*, 392 S.E.2d at 871-72. Here, the bankruptcy court acknowledged the McFarlands' testimony that they always intended the Property to be held jointly. But, the court essentially found that the McFarlands' purported intent was negated by other record evidence. For instance, the court pointed to the fact that Sherry's parents knew how title was vested, and the McFarlands "knowingly went along with this structure for more than forty years." They did this despite the fact that, setting aside the Property at issue in this case, the McFarlands owned at least one other property that was titled jointly in both of their names.

18

The bankruptcy court also noted that the McFarlands' intent to own the Property as husband and wife does not necessarily equate to intent to create a purchase money resulting trust.  Rather, to establish this type of trust, the McFarlands must have intended *at the time of the purchase* that Sherry would supply the money for the Property and that, even though Thomas had legal title to the Property, she would have equitable interest in the Property.  *See Rosado v. Rosado*, 662 S.E.2d 761, 763 (Ga. Ct. App. 2008).  And, the intention must have been contemplated in an understanding or agreement.  The court found that no such agreement or understanding to create a resulting trust was shown.

There was no indication that Atlantic Savings and Trust—the bank that loaned two-thirds of the purchase price—considered the Property to be joint property.  And no evidence was presented as to whether the bank would have financed the Property if jointly owned.  Thomas was the main financial earner for the household at the time.  The bankruptcy court further emphasized that the sellers were directed to vest title in Thomas's name alone.  On these facts, the court determined that "the evidence surrounding the intent of the parties is insufficient to rebut the presumption of a gift here."  Under the circumstances presented, we cannot say that this finding constituted clear error.  Indeed, we are not left with the a "definite and firm conviction that a mistake has been made." *In re TOUSA, Inc.*, 680 F.3d at 1310. (citation omitted).  Because the McFarlands did not rebut the

19

presumption of a gift, the bankruptcy court was correct in finding that Thomas made a transfer of his interest in the Property when he executed the 2009 Deed of Gift.

The McFarlands argue that the bankruptcy court impermissibly shifted the burden of proof away from the trustee by applying the presumptions under Georgia law explained above and by requiring the McFarlands to show that a purchase money resulting trust was created at the time of purchase. We disagree.

Here, the trustee put forward competent evidence showing that there was a transfer of an interest of the debtor. Specifically, the trustee presented evidence that in 2009 Thomas executed a Deed of Gift transferring one-half of an interest in the Property, which was titled solely in his name since the time of purchase in 1968, to Sherry. As an affirmative defense pled in their answer to the trustee's complaint, the McFarlands contended that Sherry held an interest by operation of a purchase money resulting trust.[10] To resolve this dispute, the bankruptcy court was required to look to Georgia law, *In re Sinnreich*, 391 F.3d at 1297, and Georgia law clearly provides that "[t]he burden of proving the existence of a resulting trust is on the party claiming to be the beneficiary of such a trust," *Freeman v. Saxton*, 255 S.E.2d 28, 30 (Ga. 1979). It also provides for the presumptions applied by the

---

[10]    The McFarlands then agreed in a subsequent consolidated pre-trial order, filed on August 17, 2012, that they bore the burden of establishing any defenses at trial.

20

bankruptcy court, as explained above.  Therefore, the bankruptcy court did not impermissibly shift the burden of proof away from the trustee.

For the foregoing reasons, the bankruptcy court did not err in concluding that the McFarlands failed to establish the existence of an implied purchase money resulting trust.

### 2.    Constructive Trust

Next, the McFarlands contend that equitable considerations support finding a constructive trust in these circumstances.  They argue that a constructive trust arose because Sherry made contributions to the purchase and upkeep of the property with the understanding that she would jointly own the property with Thomas.

Constructive trusts occur "whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity."  O.C.G.A. § 53–12–132 (formerly codified at O.C.G.A. § 53–12–93); *Dodd*, 550 S.E.2d at 447.  In other words, "a constructive trust is a remedial device created by a court of equity in order to prevent unjust enrichment." *Lee v. Lee*, 392 S.E.2d 870, 871 (Ga. 1990).

Our review of the underlying bankruptcy court record, including the consolidated pre-trial order, the McFarlands' proposed findings of fact and

21

conclusions of law, and their post-trial brief, shows that the McFarlands did not present the constructive trust arguments they raise on appeal to the bankruptcy court for resolution. (*See* Bankr. Dkt. Entries 43, 53, & 76). Nor did they make these arguments in their brief on appeal to the district court. (*See* Dist. Dkt. Entry 6). Rather, they asserted throughout the underlying proceedings only that a resulting trust was established. Therefore, the McFarlands cannot now complain that the bankruptcy court failed to address whether a constructive trust was established, and we decline to consider these arguments for the first time on appeal. *See In re Egidi*, 571 F.3d at 1163 (holding that an argument not raised before the bankruptcy court will not be considered for the first time on appeal).

In any case, the McFarlands' arguments do not show that the bankruptcy court erred. First, there has been no allegation of fraudulent conduct between Sherry and Thomas. *See, e.g.*, *Hall*, 149 S.E.2d at 810 ("There being no allegation of fraud in the petition before us, this opinion will be limited to a consideration of the resulting trust only.").

Second, Sherry was not induced to make valuable improvements to the land based on a representation that she would acquire an interest in the land by making the improvements. *See Lathem v. Hestley*, 514 S.E.2d 440, 441-42 (Ga. 1999) ("When . . . a party is induced to make valuable improvements on real property, a constructive trust may be imposed."). The McFarlands' reliance on *Sharp v.*

*Sumner*, 528 S.E.2d 791, 792 (Ga. 2000), and similar cases is likewise unavailing because Sherry made no improvements based on a promise to convey, *see id.* ("A donee of land under a parol gift who enters into possession and makes valuable improvements *upon the faith of the gift*, acquires a perfect equity as against the donor, his heirs and those claiming under him with notice." (ellipsis, citation, and internal quotation marks omitted; emphasis in original)).  These theories are also inconsistent with the McFarlands' testimony that they believed Sherry's interest arose at the moment of purchase.

No evidence exists that the McFarlands purchased the Property pursuant to some joint business venture or partnership.  *See, e.g.*, *Antoskow & Assoc., LLC v. Gregory*, 629 S.E.2d 1, 3-4 (Ga. Ct. App. 2005).  Rather, the intent of the McFarlands on purchasing the Property, as they assert in their brief, was personal, not for profit—"to subsequently build a house upon their retirement and to live together next to Mrs. McFarland's parents."  *See, e.g.*, *Manget v. Carlton*, 130 S.E. 604, 605 (Ga. Ct. App. 1925) (explaining that an implied trust may arise when "the parties made a contract to enter into a joint adventure, if not a partnership, for the purpose of dealing or trading in lands for profit.").

Finally, because legal title to the Property remained solely in Thomas's name for over forty years, Sherry likely "waived the right to a constructive trust by subsequent ratification or long acquiescence."  O.C.G.A. § 53-12-132.

23

In short, the McFarlands have not shown that Georgia law permits finding a constructive trust in these circumstances, nor have they explained how Thomas's holding of the beneficial interest in the Property violates an "established principle of equity." O.C.G.A. § 53–12–132. Therefore, the bankruptcy court did not abuse its discretion in concluding that equitable considerations did not support the establishment of a constructive trust. *See In re TOUSA, Inc.*, 680 F.3d at 1310 ("We review equitable determinations of the bankruptcy court for abuse of discretion.").

B.    *Actual or Constructive Fraud under 11 U.S.C. § 548(a)(1)*

Here, the bankruptcy court determined that the trustee could avoid the transfer effected by the 2009 Deed of Gift either as actually fraudulent, § 548(a)(1)(A), or as constructively fraudulent, § 548(a)(1)(B). Because we conclude that the court did not err in finding that the transfer could be avoided as constructively fraudulent under § 548(a)(1)(B), we do not address actual or intentional fraud under § 548(a)(1)(A).

To avoid the transfer in this case under § 548(a)(1)(B), the trustee bore the burden of proving, under the circumstances of this case, that Thomas (1) "received less than a reasonably equivalent value in exchange" for the transfer, and (2) believed that he would incur "debts that would be beyond [his] ability to pay." *Gen. Elec. Credit Corp. of Tenn. v. Murphy (In re Rodriguez)*, 895 F.2d 725, 726

24

n.1 (11th Cir. 1990). Whether "reasonably equivalent value" or "fair consideration has been given for a transfer is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." *In re TOUSA, Inc.*, 680 F.3d at 1311 (internal quotation marks omitted). Therefore, in *In re TOUSA, Inc.*, we reviewed the bankruptcy's court's determination of "reasonably equivalent value" for clear error. *See id.* at 1310-13.

### 1.    Reasonably Equivalent Value

Thomas contends that the trustee failed to establish the element of "reasonably equivalent value" because the trustee put forth no evidence of the Property's value at the time of the 2009 Deed of Gift. The bankruptcy court reversibly erred, he asserts, by improperly using judicial notice to establish the value of the Property and fill the evidentiary hole.

"The purpose of voiding transfers unsupported by 'reasonably equivalent value' is to protect creditors against the depletion of a bankrupt's estate." *In re Rodriguez*, 895 F.2d at 727 (citation omitted). If a transfer results in an economic benefit to the debtor, either directly or indirectly, the transfer cannot be avoided. *Id.*; *see Crumpton v. Stephens (In re Northlake Foods, Inc.)*, 715 F.3d 1251, 1257 (11th Cir. 2013) ("The concept of reasonably equivalent value does not require a dollar-for-dollar transaction."). We scrutinize the value of transfers more closely where, as here, the transfer was made to an insider. *Advanced Telecomm. Network,*

*Inc. v. Allen (In re Advanced Telecomm. Network, Inc.)*, 490 F.3d 1325, 1336-37 (11th Cir. 2007); *see* 11 U.S.C. § 101(31)(A)(i) (defining the term "insider" as a "relative of the debtor").

The bankruptcy court determined that no "value," as defined by 11 U.S.C. § 548(d)(2)(A), was given by Sherry in exchange for the transfer of Thomas's interest in the Property. The court further found that, even if some value were given, such value was plainly not equivalent to the value of a one-half interest in the Property, which the court found was $350,000. In determining the value of the Property, the bankruptcy court took judicial notice of Schedule A of Thomas's bankruptcy petition, which listed Thomas's one-half interest in the Property at $350,000 as of the petition date in February 2011.

After review, we conclude that the bankruptcy court did not clearly err in finding that no "reasonably equivalent value" was provided for the transfer of interest in the Property because the record supports a determination that no "value" was given "in exchange for" the transfer. 11 U.S.C. § 548(a)(1)(B)(i); *see Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 612 (B.A.P. 8th Cir. 2001) (stating that the concept of reasonably equivalent value "requires analysis of whether: (1) value was given; (2) it was given in exchange for the transfers; and (3) what was transferred was reasonably equivalent to what was received"); *see also In re Advanced Telecomm. Network, Inc.*, 490

26

F.3d at 1337 (concluding that certain value did not count because it was not given "in exchange for" for the transfer).

For purposes of § 548, the term "value" "means property, or satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A). The 2009 Deed of Gift recites the following as consideration for the transfer: (1) Thomas's love and affection for Sherry; (2) Sherry's contribution to the purchase of the Property by obtaining a loan from her father; (3) payments Sherry made on the loans while Thomas was overseas; and (4) maintaining the Property over the years. No consideration was given for the 2009 Deed of Gift other than what was stated on the face of the Deed.

This Court has held that "love and affection" are inadequate consideration to be reasonably equivalent value for a transfer. *Walker v. Treadwell (In re Treadwell)*, 699 F.2d 1050, 1051 (11th Cir. 1983). In addition, Sherry did not give Thomas any property or satisfy or secure any of his debts. *Id.*; 11 U.S.C. § 548(d)(2)(A). And the face of the Deed identifies the transfer as a "Deed of Gift." *See In re Treadwell*, 699 F.2d at 1051 ("[A] debtor's gifts . . . are voidable by the trustee."). In other words, Thomas received nothing in exchange for the transfer that would be valuable to his creditors. *See In re Rodriguez*, 895 F.2d at 727.

27

Thomas contends that, without evidence of the value of the Property, the bankruptcy court could not analyze whether reasonably equivalent value was given.  But we must give considerable latitude to the trier of facts, *In re TOUSA, Inc.*, 680 F.3d at 1311, and the totality of the circumstances in this case supports a finding that the Property had substantial, or at least some, value, even without considering the value listed in Thomas's bankruptcy schedules.  At trial, Thomas explained that he believed his own assets, which included a one-half interest in the Property, would be sufficient to cover the plaintiff's initial $500,000 settlement request.  And once the mediation failed, Thomas transferred the one-half interest to his wife in order to protect her purported interest in Property, indicating that both Thomas and the personal-injury plaintiff believed the Property was valuable at the time of transfer.

Therefore, we do not address the issue of whether the bankruptcy court erred in taking judicial notice of Thomas's bankruptcy schedules because calculating the precise value of the Property is unnecessary to our analysis.  *See, e.g.*, *Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 214 (3d Cir. 2006) (stating that where there is sufficient evidence to conclude under the totality of the circumstances that the benefits to the debtor are minimal and plainly not equivalent to the value of a transfer of a substantial asset, the precise value of

the benefit is unnecessary to the court's analysis). Any error the bankruptcy court made in judicially noticing and admitting the bankruptcy schedules as evidence was harmless under the circumstances. *See* 28 U.S.C. § 2111 (directing appellate courts to disregard harmless errors); Fed. R. Civ. P. 61.

In short, the totality of the circumstances supports the bankruptcy court's determination that no value, as defined by § 548(d)(2)(A), was given in exchange for the transfer of a valuable asset of the debtor. *See* 11 U.S.C. § 548(a)(1)(B)(i). We therefore conclude that the bankruptcy court did not clearly err in finding that Thomas received "less than a reasonably equivalent value," despite the fact that the trustee did not introduce evidence of the value of the interest transferred. *See In re TOUSA, Inc.*, 680 F.3d at 1310-11; *In re Fruehauf Trailer Corp.*, 444 F.3d at 214.

## 2.    Incurring Debts Beyond Debtor's Ability to Pay

Finally, Thomas argues that the trustee failed to introduce sufficient evidence to show that he believed that his assets were insufficient to satisfy a potential judgment against him. Specifically, Thomas contends, the trustee failed to establish the value of his assets or his ability to pay the judgment at the time of the 2009 Deed.

Constructive fraud may be shown when the debtor received less than reasonably equivalent value in exchange and "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as

29

such debts matured." 11 U.S.C. § 548(a)(1)(B). The trustee need not show that the debtor was insolvent at the time, § 548(a)(1)(B)(i)(I), which is an alternative basis for finding constructive fraud, or that debtor intended to defraud creditors by the transfer, § 548(a)(1)(A).

After a careful review of the entire record, we are not left with a "definite and firm conviction" that the bankruptcy court erred in finding that Thomas conveyed the interest in the Property to his wife at a time when he believed that he would incur debts beyond his ability to pay. *See* 11 U.S.C. § 548(a)(1)(B)(ii)(III). According to the court, "[Thomas] was well aware at the time of the transfer that [the personal-injury plaintiff] had been seriously injured, had suffered substantial lost wages, and required substantial medical treatment as a result of the traffic incident." *In re McFarland*, 2013 WL 5442406, at *15.

Thomas points out that he believed that his assets would cover the $500,000 settlement amount initially requested by the plaintiff and that the judgment would not exceed $500,000. But, as the court explained, the 2009 Deed came shortly after the mediation failed, when Thomas believed that the plaintiff intended to "ruin" him financially, and Thomas testified that he undertook the transfer to protect Sherry's purported one-half interest in the Property from creditors. Thus, the fact of transfer indicates that Thomas believed that the judgment could exceed his own assets and put Sherry's purported one-half interest in jeopardy. Although

30

no judgment had yet been entered in the personal-injury lawsuit at the time of transfer, the bankruptcy court concluded that the circumstances showed "a belief that the judgment would exceed the value of [Thomas's] assets at the time [Thomas] initiated the transfer to [Sherry]." *Id.* at *16.

In view of these facts and the bankruptcy court's explanation of its findings, we cannot say that the court clearly erred in determining that Thomas believed he would incur debts beyond his ability to pay under § 548(a)(1)(B)(ii)(III).

## IV.

In sum, we hold that the bankruptcy court did not err in granting the trustee's motion to avoid the transfer effected by the 2009 Deed of Gift under 11 U.S.C. § 548(a)(1). Therefore, we affirm.

**AFFIRMED.**